COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, Powell and Senior Judge Clements


WELDON A. MONGOLD

MEMORANDUM OPINION[*]

v.        Record No. 1827-10-3

PER CURIAM
MARCH 1, 2011

HARRISONBURG ROCKINGHAM
  SOCIAL SERVICES DISTRICT


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Thomas J. Wilson, IV, Judge

(Roland M.L. Santos, on brief), for appellant.

(Kimberly V.H. Gutterman, Assistant County Attorney; W. Andrew
Harding, Guardian *ad litem* for the minor child; Eldridge, Elledge,
Evans & Harding, PLC, on brief), for appellee.


Weldon Mongold (father) appeals an order terminating his parental rights to his

nine-year-old son, Z.M. Father argues the evidence failed to establish the conditions that led to

Z.M.'s neglect could not be substantially corrected or eliminated to allow Z.M. to be placed with

him in a reasonable period of time. Father also argues the trial court erred in concluding the

evidence supported an order placing Z.M. in permanent foster care with the goal of adoption. Upon

reviewing the record and briefs of the parties, we conclude this appeal is without merit.

Accordingly, we summarily affirm the decision of the trial court. See Rule 5A:27.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to

it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of Human

Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

The Harrisonburg Rockingham Social Services District (HRSSD) began in-home services for Z.M. and his three older siblings in 2004 when he was living with his mother and father, who were married at the time.[1]  The services began because HRSSD had many concerns about the well-being of the family.  Specifically, one of the older children attempted suicide, and the mother, who had also attempted suicide earlier that year, was heavily medicated at the time services began.  The children had numerous bouts of lice, the home smelled of urine and animal feces, Z.M.'s speech was unintelligible, he was not toilet trained, and he communicated with his mother by hitting her.  Although father was present in the home when services began, he did not participate in any of the services with HRSSD.

Father moved out of the marital home in October 2006.  In November 2006, Z.M. was removed from his mother's care after she attempted suicide in front of him.[2]  Father was contacted on the evening of the attempted suicide, but was unable to remove Z.M. and his older brother from the home because he was too intoxicated to drive.  After living with his grandmother for approximately two months, Z.M. was placed in foster care with the goal of being returned home.

While Z.M. was in foster care, father completed anger management and parenting classes, and HRSSD began working to place Z.M. with his father.  In May 2008 father received custody of Z.M.  The custody order severely restricted contact between Z.M. and his mother.  Sometime in 2009, HRSSD received information that Z.M. was living with his mother, in violation of the custody order.  However, because of the lack of a Child Protective Services complaint, HRSSD determined it could not take action.

In December 2009, Z.M. was again removed from his mother's care after HRSSD received a complaint of a domestic dispute between mother and her boyfriend.  HRSSD found mother and

---

[1] Mother's three older children are not father's biological children.

[2] Two older siblings were removed from the home in March or April 2006.

Z.M. living in a residence with exposed wires, inadequate heating, and trash strewn about the residence. HRSSD did not return Z.M. to his father's care at that time because father's new girlfriend had a history of child abuse and prescription pain medication dependency. Although father denied the relationship with his new girlfriend, a surprise visit to father's house in February 2010, produced evidence a woman other than father's grandmother was living with him. At a scheduled visit with Z.M. later that day, father became agitated with the social workers, and argued he had "a constitutional right to associate with whomever he chose." After father made inappropriate statements to Z.M., the social worker determined the scheduled visit would not occur, to which father responded, "fine, just give him to his mother and I will deal with her."

The trial court entered orders terminating father's parental rights to his son on August 24, 2010. This appeal followed.

## ANALYSIS

A termination of parental rights under Code § 16.1-283(B) is proper upon a showing of clear and convincing evidence that it is in the best interest of the child and:

> 1. The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and
>
> 2. It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.
>
> Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subdivision B 2 hereof:
>
> a. The parent or parents are suffering from a mental or emotional illness or mental deficiency of such severity that there is not reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development.

*    *    *    *    *    *    *

> c. The parent or parents, without good cause, have not responded to or followed through with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate or prevent the neglect or abuse of the child.

Further, although termination under the statute requires a prospective look,

> Virginia law recognizes the "maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past." Petry v. Petry, 41 Va. App. 782, 793, 589 S.E.2d 458, 463 (2003). "As many courts have observed, one permissible measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child." Id. (citation omitted).

> "No one can divine with any assurance the future course of human events. Nevertheless, past actions and relationships over a meaningful period serve as good indicators of what the future may be expected to hold." Winfield v. Urquhart, 25 Va. App. 688, 696-97, 492 S.E.2d 464, 467 (1997) (citations omitted).

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 267-68, 616 S.E.2d 765, 770 (2005).

Here, HRSSD has been involved with Z.M. and his family for five years. In that time, father has shown an inability or unwillingness to prevent Z.M. from living in unsuitable conditions, and from being around people who have a history of abuse or mental health problems. Specifically, despite a custody order that removed Z.M. from his mother's care and placed Z.M. in his father's care, father willingly permitted Z.M. to return to the care of his mother, who has a history of severe psychiatric problems. Since his break-up with Z.M.'s mother, father has had one relationship with a woman who had her own children removed by HRSSD while father was living in that home, and another relationship with a woman who is a known child abuser. Further, the evidence demonstrated father still does not understand the importance of protecting Z.M. from people who have histories of abuse or mental health problems. For example, when Z.M. was removed from his mother's care for a second time and

- 4 -

was in HRSSD custody, after becoming angry that he wouldn't be able to visit with Z.M., he suggested HRSSD return Z.M. to his mother yet again so father could just "deal with [mother]."

Additionally, while father insists the problems which led to Z.M.'s removal were attributable solely to Z.M.'s mother, and not to him, the record also indicates father has a history of mental illness, specifically maladaptive personality disorder and anxiety, and his pattern of behavior indicates an unwillingness to ensure his son is surrounded by responsible adult figures.

Finally, the evidence supports the trial court's conclusion that returning Z.M. to father's care is not in Z.M.'s best interests, and a permanent foster care placement with the goal of adoption pursuant to Code § 63.2-908 is appropriate. Z.M. is currently in an adoptive placement with the family that adopted his older half-brother. He is in regular contact with his half-sisters. Z.M. is excelling in school, and no longer needs special education services with the exception of speech therapy.

CONCLUSION

For the foregoing reasons, the trial court's ruling is summarily affirmed. Rule 5A:27.

Affirmed.